**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| In re: | |
| | |
| **CHARLIE GOSE DICKENSON, JR.,** | **Chapter 12** |
| | |
| Debtor. | **Case No. 13-71283** |

**MEMORANDUM OPINION**

The question this Court must answer is whether to dismiss the debtor's case for his failure to disclose assets, failure to disclose appropriate values, failure to comply with court orders, and other cause under 11 U.S.C. § 1208. The chapter 12 trustee advocates for dismissal under § 1208(c). Conversely, the debtor argues these mistakes are not sufficient to justify dismissal. For the reasons described below, the Court concludes that cause exists to dismiss this case pursuant to 11 U.S.C. § 1208. The Court, therefore, grants the chapter 12 trustee's motion to dismiss.

**FINDINGS OF FACT & PROCEDURAL HISTORY**

Charles Gose Dickenson filed a chapter 12 petition on August 7, 2013. *See* Chapter 12 Petition, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Aug. 7, 2013) ECF Doc. No. 1. Two weeks later, on August 21, Mr. Dickson filed his bankruptcy schedules and statements. *See* Balance of Schedules, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Aug. 21, 2013) ECF Doc. No. 11. The next month, on September 19, 2013, the chapter 12 trustee conducted the section 341 Meeting of Creditors, which he continued to November 21, 2013, when it concluded. In the interim, on October 4, the debtor filed his amended Schedule A ("First Amended Schedule A") and amended Schedule D. *See* Amended Schedule A, Amended Schedule D, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Oct. 4, 2013) ECF Doc. No. 14.

Shortly thereafter, on October 21, 2013, Farm Credit of the Virginias, ACA ("Farm Credit"), filed a motion for relief from stay for cause under section 362, citing a lack of adequate protection. *See* Motion for Relief at 10, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Oct. 21, 2013) ECF Doc. No. 15. According to Farm Credit, as of the petition date, Mr. Dickenson owed it approximately $1,086,832.80, which represented roughly seventy percent of Mr. Dickenson's total debt and was secured by five separate tracts of real estate and certain items of personal property. *Id.* at 9–10. Farm Credit alleged that the collateral was insufficient to fully secure its claim and that the debtor was unable to provide it with adequate protection. *Id.*

Mr. Dickenson responded to the motion for relief by admitting all of the facts; except, he denied that Farm Credit had any lien on his farm products and denied that relief from stay was appropriate. *See* Response to Motion for Relief at 1–2, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Oct. 31, 2013) ECF Doc. No. 21. Furthermore, Mr. Dickenson asserted that granting Farm Credit relief from stay would not be in the best interest of the creditors. Specifically, he argued:

> Granting relief from the automatic stay, could generate a large deficiency judgment which would and or [sic] could harm other unsecured creditors. The debtor asserts that his farm properties are being maintained and are not suffering any loss or depreciation in value. Therefore, the interest of the movant is adequately protected and the automatic stay should not be lifted or modified.

*Id*.

The parties agreed to continue the hearing on the motion for relief; however, prior to the continued hearing, the parties reached an accord wherein Farm Credit would table and continue its motion for relief for seven more months, until October 2014, in exchange for Mr. Dickenson providing adequate protection to Farm Credit in the form of a $10,000[1] payment and an additional lien on other collateral. *See* Order Approving Adequate Protection, *In re Dickenson*,

---

[1]  The $10,000 to come was from the sale of other, unencumbered, property.

13-71283 (Bankr. W.D. Va. Mar. 24, 2014) ECF Doc. No. 64.  The additional collateral was allegedly the debtor's one-quarter interest in unencumbered real property described as "parcel(s) of land identified as Tax Map Numbers 158R 2085, 141L SB 1549, 139L 596A, 139L 596, and 142L 1699 (each in Russell County, Virginia)."  *Id*. at 2.  Along with this consent order, Mr. Dickenson also petitioned the Court for authority to: (1) sell his one-eighth interest in real property, colloquially known as "the George Osborne Real Property," to his sister for a price of $10,733.90, (2) remit $10,000 from the sales proceeds to Farm Credit as adequate protection, and (3) grant Farm Credit a lien on other collateral as additional adequate protection.  *See* Motion to Sell, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Dec. 19, 2013) ECF Doc. No. 38.  After notice and hearing, the Court approved the consent order and authorized the sale with the specified conditions.  *See* Order Granting Motion to Sell, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Mar. 24, 2014) ECF Doc. No. 65.

After Farm Credit filed its motion for relief, on November 4, 2013, Mr. Dickenson filed his chapter 12 plan for reorganization ("the November 4 Plan").  *See* Chapter 12 Plan, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Nov. 4, 2013) ECF Doc. No. 22.  The chapter 12 trustee and two of the debtor's four secured creditors—Farm Credit and New Peoples Bank—filed objections to confirmation of the November 4 Plan.  Along with his objection to confirmation, the chapter 12 trustee also sought dismissal of the case, citing 11 U.S.C. § 1208.  Trustee's Objection at 2, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Nov. 8, 2013) ECF Doc. No. 25.

During the confirmation hearing, the debtor conceded the November 4 Plan could not be confirmed over the objections of Farm Credit and New Peoples Bank.  Additionally, the chapter 12 trustee argued the plan could not be confirmed, because (1) it provided a payment term for unsecured creditors exceeding the period permitted under section 1222; (2) it was unclear in its

payment terms for its debts to the County Treasurer; (3) it did not provide sufficient funding to pay the claims as proposed; and (4) most importantly, the trustee was unable to determine the extent of the debtor's ownership interests in real property and was uncertain if the Code permitted the treatment proposed in the plan, wherein the debtor would transfer certain property to a certain secured creditor. *Id.* Accordingly, the Court entered an order denying confirmation of the plan and directing Mr. Dickenson to file an amended plan within fourteen days, absent which the Court would dismiss the case.

The debtor filed an amended plan on March 25, 2014 ("the March 25 Plan"), and noticed it to be heard on May 8, 2014, which the Court set aside as a special hearing date specifically for these matters. *See* Amended Chapter 12 Plan, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Mar. 25, 2014) ECF Doc. No. 67. Nearly every secured creditor filed an objection to the March 25 Plan.

One month later, on April 23, Mr. Dickenson docketed a pleading entitled "Motion to Exchange Property (11 U.S.C. § 363(b))," but which was actually a motion to sell ("the Motion to Exchange"). Motion to Exchange, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Apr. 23, 2014) ECF Doc. No. 75. As part of the relief requested, the debtor also sought approval of a reduction in the notice period required by Rule 2002 to fourteen days. *Id.* at 2. The Motion to Exchange stated that the debtor was the owner of a one-quarter interest in approximately 200 acres of property, which he desired to transfer to his nephew. *Id.* According to the Motion to Exchange, "[t]he debtor desires to exchange his interest in this farm in exchange for the conveyance by his nephew . . . of his nephew's three-quarter (3/4) interest in another farm of fifty (50) acres." *Id.* Thus, the Motion requested that Mr. Dickenson "be authorized to exchange properties with his nephew." *Id.*

Although the request sought permission prospectively, the debtor had, in fact, already transferred his interest in the 200 acres to his nephew.  Indeed, the Motion to Exchange acknowledged that "one portion" of the exchange had already occurred, because Mr. Dickenson conveyed his one-quarter interest in 203.86 acres located in Russell County, Virginia, to his nephew by a deed dated, and signed on, July 29, 2013.[2]  *Id.*  Mr. Dickenson's nephew subsequently recorded this deed on October 21, 2013, before the adjourned 341 meeting.  May 8 Transcript at 18, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. May 22, 2014) ECF Doc. No. 105 [hereinafter *May 8 Transcript*].  Similarly, Mr. Dickenson's nephew conveyed to Mr. Dickenson the nephew's three-quarter interest in fifty acres located in Russell County, Virginia, by a deed dated July 26, 2013, and signed on July 29, 2013.  *See* Exhibit F to Trustee's Objection of Motion to Exchange, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. May 8, 2014) ECF Doc. No. 85.  Mr. Dickenson, however, never recorded the deed.  *May 8 Transcript*, at 42–43.  By filing the Motion to Exchange, the debtor hoped the Court would enter an order retroactively approving this transaction.

On April 30, 2014, shortly after filing the Motion to Exchange, Mr. Dickenson filed another amended plan ("the April 30 Plan"), which was more than a month after the Court's deadline to do so, ultimately frustrating the purpose of the special hearing on May 8 (the "May 8 Hearing").  *See* Second Amended Chapter 12 Plan, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Apr. 30, 2014) ECF Doc. No. 77.  With only eight days before the special hearing date, the creditors did not have sufficient time to consider whether the April 30 Plan resolved their existing objections or gave rise to any new ones.  *See* FED. R. BANKR. P. 2002(a)(5).

Two days later, on May 2, 2014, the chapter 12 trustee filed an objection to the Motion to Exchange.  *See* Trustee's Objection to Motion to Exchange, *In re Dickenson*, 13-71283 (Bankr.

---

[2]     The parties signed these deeds nine days prior to the petition date.

W.D. Va. May 2, 2014) ECF Doc. No. 78.  One of the grounds raised by the trustee in opposition

to approval of the exchange was the debtor's failure to disclose in his schedules his interest in the

200 acres he sought to transfer as well as the clandestine nature of the transaction with his

nephew.  *Id.* at 1.  Although the Court could not confirm the April 30 Plan, it resolved to go

forward and hear the other matters already set for the May 8 Hearing—including the Motion to

Exchange.

The May 8 Hearing

At the outset of the May 8 Hearing, counsel for Mr. Dickenson moved to withdraw his

Motion to Exchange; however, the chapter 12 trustee, who responded in opposition to the

Motion, objected to its withdrawal.  *May 8 Transcript*, at 22–23.  The Court denied the motion to

withdraw, so counsel for the debtor proceeded with evidence in support of the Motion to

Exchange.  *Id.* at 68.  Mr. Dickenson was the only witness to testify.

Mr. Dickenson testified that his failure to disclose both his interest in the 203.86 acres

and his transfer of that interest to his nephew was simply an innocent mistake.  *Id.* at 29 ("I had a

lot of pieces of property and I guess I overlooked that."); *id.* at 44 ("I didn't forget [about the

transfer].").  Throughout the hearing, Mr. Dickenson continually referred to his failure to

disclose this information as "an oversight," and he explained the omission was merely because

he "didn't have the tax tickets."  *Id.* at 44.  When pressed on whether he had made any other

mistakes or omissions in his schedules, he stated, "I feel sure I have.  And I'm not going to say

that I haven't.  I could have."  *Id.*

Mr. Dickenson explained that he owned a one-quarter interest in both the fifty- and 200-

acre parcels, and his nephew owned the remaining three-quarters interest in each property.[3]  *See*

---

[3]        Mr. Dickenson testified that New Peoples Bank has a lien on his nephew's three-quarter interest in the real
estate, but the lien does not encumber any of Mr. Dickenson's interest.  *May 8 Transcript*, at 57–58.  According to

*id.* at 28–34.  In Mr. Dickenson's opinion, if he could exchange his one-quarter interest in the 200-acre parcel for his nephew's three-quarter interest in the fifty-acre parcel, thereby giving Mr. Dickenson full ownership of the fifty-acre tract, the value per acre of the property would increase.  *Id.* at 46.  Furthermore, Mr. Dickenson owned an adjoining parcel of land to this tract of fifty acres, so consummating the transfer would increase his road frontage, thereby increasing the value of the adjacent property as well.  *Id.*

When pressed further to discuss his valuation of the properties, Mr. Dickenson testified that he believed the value of fifty-acre parcel was around $1900 per acre, which would increase to about $2000 per acre if he owned the entire property outright with no other interest holders.  *Id.* at 63.  Although Mr. Dickenson acknowledged that his schedules valued the property at only $1700 per acre, he could not explain the discrepancy between his current statements regarding valuation and the values he scheduled.  *Id.* at 59, 62.

Furthermore, throughout his examination, Mr. Dickenson could not definitively identify which particular parcel of land was subject to this transfer between himself and his nephew.  *See id.* at 34, 35, 37, 63.  Again, when pressed, he explained that he did not have the "tax tickets," so he just forgot to list it in his schedules, even though the transfer occurred merely days before he filed his petition, when he would have been preparing his schedules.  *Id.* at 26, 29, 34, 36, 44.

Later in the hearing, the chapter 12 trustee also confronted Mr. Dickenson about his Statement of Financial Affairs.  According to his Statement of Financial Affairs, Mr. Dickenson indicated that he had not transferred any property within the two years immediately preceding the filing of his bankruptcy petition.  *See* Exhibit B at 5, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. May 8, 2014) ECF Doc. No. 81.  Mr. Dickenson acknowledged that he failed to

---

the testimony, New Peoples Bank was not aware that the property had been conveyed by a deed, albeit unrecorded, to Mr. Dickenson in exchange for other real property. *Id.* at 28.

disclose the transfers to and from his nephew, and, once again, he asserted that this failure to disclose was simply an oversight.  *See May 8 Transcript*, at 36, 37, 65.

When asked about these discrepancies in the record, Mr. Dickenson readily admitted that he intentionally concealed the interest in real property that his nephew conveyed to him and intentionally did not record the deed.  *Id.* at 28.  "I did not record my 50 acre deed because I knew I had to come before the Court to get that approved."  *Id*.  When asked why he thought he had to come before the Court to request permission to record deeds that he executed prior to his filing for bankruptcy, he testified, "I guess I was aware not to do that. That I had to come before this Court to do that, I guess."  *Id.* 55.  Mr. Dickenson did not, however, explain why he decided to wait ten months after filing his petition to come before the Court to request approval of the exchange as opposed to doing so right after filing.

At the conclusion of the May 8 Hearing, the Court continued the hearing on confirmation of the plan and objections thereto to June 5 (the "June 5 Hearing") to allow time for adequate notice and opportunity to object to the plan.  *Id.* at 67–68.  The Court, in addition, continued the hearing on the chapter 12 trustee's motion to dismiss to June 5 and orally ruled:

> [T]he debtor shall appear and show cause at the continued hearing date why the case should not be dismissed for the debtor's bad faith in failing to disclose all assets and up to date values of those assets to the extent that there has not been a full and complete disclosure of assets and values as of June 5[, and in] addition, whether the plan should be denied confirmation for not being filed in good faith to the extent that it does not address all assets that are in this case and full values of the assets as of June 5.

*Id.* at 68–69.  The Court's ruling was incorporated in orders.

## The June 5 Hearing

Prior to the continued hearing on June 5, the debtor filed another amended Schedule A ("Second Amended Schedule A") as well as several operating reports and a "Second Amended

Chapter 12 Plan."[4]  Second Amended Schedule A, *In re Dickenson*, 13-71283 (Bankr. W.D. Va.

May 16, 2014) ECF Doc. No. 89; Second Amended Chapter 12 Plan, *In re Dickenson*, 13-71283

(Bankr. W.D. Va. May 13, 2014) ECF Doc. No. 88.  At the June 5 Hearing, the Court took

testimony from two witnesses—Ms. Nancy Dickenson, who is the debtor's sister, and Mr.

Dickenson.  Nancy Dickenson took the stand first.

Ms. Dickenson testified that her nephew was experiencing financial problems, so she

signed on as guarantor for some of his loans.  June 5 Transcript at 10–11, *In re Dickenson*, 13-

71283 (Bankr. W.D. Va. June 27, 2014) ECF Doc. No. 130 [hereinafter *June 5 Transcript*].  In

an effort to improve his financial condition, the nephew sought out a refinancing loan from First

Bank and Trust for $150,000, secured by the "Home Place" (the 200-acre tract), but the bank

required the nephew to own the property outright, with no other interest holders.  *Id.*

Accordingly, the nephew had to obtain Mr. Dickenson's one-quarter interest in the Home Place,

in exchange for which, the nephew would give Mr. Dickenson his three-quarter interest in the

fifty-acre "George Gose Place."  *Id.* at 24–25.  To consummate this deal, Ms. Dickenson

admitted to having encouraged her nephew and the debtor to exchange the properties; however,

she denied having knowledge of the debtor's intention to petition for bankruptcy.[5]  *Id.* at 11, 14.

After the exchange, Ms. Dickenson admitted to having urged the nephew to record his deed, but

she asserted that she did not realize the impact it would have on her brother's bankruptcy.  *Id.* at

17.  Furthermore, Ms. Dickenson explained that Mr. Dickenson never recorded his deed, because

after the exchange, she kept, and still has, the deed transferring property to Mr. Dickenson.  *Id.* at

11, 18–21, 28.

---

[4]     Although styled as a "Second Amended Plan," this plan was actually Mr. Dickenson's third amended plan.

[5]     After she admitted to knowing Mr. Dickenson was experiencing financial difficulty, had considered
bankruptcy in the past, and was facing foreclosure actions initiated by New Peoples Bank, Ms. Dickenson testified
that she did not expect him to actually file.  *Id.* at 14.

Next, the debtor took the stand.  To begin, Mr. Dickenson testified that he filed his

Second Amended Schedule A to "cure" his previous omission of the parcels of property as well

as to include both the tax-assessed values of the properties and his personal valuations of the

properties.  *Id.* at 37.  When asked by the trustee why he had failed to include these parcels of

property when amending his schedules earlier in the case, the debtor responded, "I guess I was

just unaware of it."  *Id.* at 38.

On cross examination, the chapter 12 trustee walked Mr. Dickenson through each of his

iterations of Schedule A, identified which parcels he had omitted in the earlier iterations, and

questioned him as to why these parcels were not disclosed after the prior amendments.  Mr.

Dickenson could offer no explanation except that it was an oversight.  *Id.* at 42, 44, 45.

Furthermore, the trustee asked Mr. Dickenson why he had still failed to include the property

transferred to him from his nephew in his Second Amended Schedule A.  *Id.* at 45.  Mr.

Dickenson, once again, could not explain this omission.[6]  *Id.*

Delving further into the Second Amended Schedule A, the trustee confronted Mr.

Dickenson about three newly disclosed pieces of property,[7] called the "Ramsey Land," and

questioned him about the transfer and ownership interests therein.  Mr. Dickenson asserted he

had purchased these parcels "about two, three years ago."  *Id.* at 46.  Curiously, however, Mr.

Dickenson was a party to a deed transferring to him a one-half interest in that property on

February 19, 2014, with the other one-half interest to Michael Hilton, II, and Claude Hart.  *See*

---

[6]     Mr. Dickenson claimed he had executed a deed of rescission prior to the hearing; however, his counsel
could not produce the document at the hearing and he had not electronically filed it prior to the hearing.  *Id.* at 22.

[7]     Upon closer inspection of the previous iterations of Schedule A, it appears Mr. Dickenson had disclosed
these parcels already, albeit as three separate tracts and valued at a lower total amount.  *See* Schedule A at 2–3, *In re
Dickenson*, 13-71283 (Bankr. W.D. Va. Aug. 21, 2013) ECF Doc. No. 11.  Interestingly, Mr. Dickenson failed to
remove the prior disclosures of these parcels in his Second Amended Schedule A, so even after his third try,
Schedule A remains defective.

Exhibit N, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. June 4, 2014) ECF Doc. No. 122.

Although Mr. Dickenson asserted he had owned a one-quarter interest in the property for two to

three years, he could not explain how the February 2014 deed conveyed, from a third party, a

one-half interest to him and his wife, as tenants by the entirety with right of survivorship, and

another one-half interest to Mr. Hart and Mr. Hilton. *Id.* at 48.

      Furthermore, in explaining his relationship with the aforementioned Mr. Hart and Mr.

Hilton, Mr. Dickenson continually referred to them as his "partners;" however, he could not

explain why he had not listed Mr. Hilton and Mr. Hart as partners in his statement of financial

affairs or his interest in the partnership on his Schedule B.[8]  *June 5 Transcript*, at 48–51.

Furthermore, he could not explain why he had not sought approval of, or disclosed, the purchase

of this property in February to the Court, which ultimately resulted in a further indebtedness to

the estate.[9]  *Id.*  The trustee also asked Mr. Dickenson why, in his Second Amended Schedule A,

he valued those tracts of real estate at $21,300, but the deed dated only four months earlier

indicated he had paid $24,368 for it.  *Id.* at 51–52.  Though Mr. Dickenson's schedules claimed

he had valued the properties at their actual costs, when asked to explain why the valuation was

different from the cost he paid only a few months earlier, Mr. Dickenson responded, "I don't

know."  *Id.* at 52.

      Upon hearing of the February 2014 deed, counsel for Farm Credit realized one of the

tracts of property included therein was that which Mr. Dickenson had pledged as adequate

---

[8]      Although the association between Dickenson, Hilton, and Hart was not subject to a formal partnership agreement,  according to the Virginia Code, a partnership is any "association of two or more persons to carry on as co-owners a business for profit formed under § 50-73.88, predecessor law, or comparable law of another jurisdiction, and includes, for all purposes of the laws of this Commonwealth, a registered limited liability partnership." VA. CODE ANN. § 50-73.88.  Furthermore, business includes "every trade, occupation, and profession." *Id.*

[9]      Mr. Dickenson's failure to disclose this transaction is especially disconcerting to the Court, since he had previously testified that he did not disclose the transaction with his nephew because he knew he had to get the Court's permission before recording the deed. *See May 8 Transcript*, at 55.

protection to his client as part of their compromise to settle its motion for relief from stay.  *Id.* at

59–64.  After the trustee's questioning, Farm Credit's counsel also asked questions about how

Mr. Dickenson could have pledged the property as adequate protection, when he apparently did

not own any interest in it at the time.  *Id.* at 63.  Mr. Dickenson claimed the deed must have been

wrong, saying, "[w]ell, I guess it's a mistake.  I don't know."  *Id.*  Furthermore, Mr. Dickenson,

disclosed that Mr. Hilton and Mr. Hart were already timbering the property, without approval

from Farm Credit, without any of the proceeds going to the estate, and without ever even

disclosing the presence of marketable timber[10] on the property.  *Id.* at 56–57.  Instead, according

to Mr. Dickenson's testimony, the proceeds from the sold timber went "to pay the debt off.  The

purchase price."  *Id.* at 56.  When asked to whom he owed this debt, he responded, "Claude Hart

and Mike Hilton."  *Id.*

In conclusion, the trustee asked Mr. Dickenson if he could find anywhere in the schedules

where he disclosed the existence of a life insurance policy, for which he had reported a $683.28

per month payment on his Operating Reports.  *Id.* at 53.  Mr. Dickenson responded that he had

"evidently not" disclosed it.  *Id.*  Continuing, the trustee asked if he had disclosed anywhere in

the schedules the transfer of the property to his nephew, which Mr. Dickenson again said that he

had not.  *Id.* at 54–55.  Finally, the trustee asked Mr. Dickenson about some cattle that he had

recently sold.[11]  Mr. Dickenson testified that he had sold one load of cattle in April 2014, and

another load was still on the feed lot, ready for sale.  *Id.* at 58.  He explained further, "[a]fter all

the expenses and the loan payment was made," "we received $36,000" for that first load of

cattle.  *Id.*  When asked why his operating reports had not disclosed the sale of the cattle, the

---

[10]     Mr. Dickenson also testified that he believes the property has valuable mineral deposits, which he also had
not scheduled as an asset of the estate.  *Id.* at 55.

[11]     Ms. Dickenson testified earlier in the hearing, "I know that we have sent two loads [of cattle] to the feed
lot.  We have one ready to go next week and two more on the farm being readied to go."  *Id.* at 35.  She then
suggested asking Mr. Dickenson about the cattle, as he would be more knowledgeable about the topic.  *Id.*

payment of the expenses and loan, or the receipt of $36,000, he informed the Court, "[t]he [proceeds from the sale of] cattle goes into my sister's checking account." *Id.* at 59. When asked when he will receive income from the sale of cattle, Mr. Dickenson responded, "I feel like as I need the money to pay my debts, that's when I'll be drawing from that account to pay my debts, make my payments." *Id.*

According to the testimony and record in the case, the Court finds the following facts. Mr. Dickenson:

1. Failed to disclose in his initial schedules his interest in various parcels of real estate, including sixteen acres in Bear Branch, a one-half interest in 64.5 acres at Lick Creek, and a one-quarter interest in 200 acres in Russell County.

2. Filed a Second Amended Schedule A that lists various tracts of property twice, with different valuations for same the parcels. *See* Second Amended Schedule A at 3, 7, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. May 16, 2014) ECF Doc. No. 89 (listing the properties separately at the top of page 3, worth $15,100 in total, and listing the properties as a single entry on page 7 at $21,300).

3. Failed to disclose accurate or consistent valuations of the property listed in his original and amended schedules.

4. Failed to file schedules and statements with sufficient detail and accuracy to enable the Court to determine whether a proposed plan provides for all creditors, is feasible, and complies with the requirements of section 1225(a)(4).

5. Failed to disclose the transfer of his one-quarter interest in the 200-acre Home Place property to his nephew on any of the various iterations of his schedules and failed to reveal the alleged rescission or produce the deed of rescission.

6.  Failed to disclose his interest in the George Gose Place, conveyed to him by his nephew in the deed that his sister held for him and he did not record.

7.  Failed to disclose the existence of any transfer of real estate in his Statement of Financial Affairs within the two years prior to filing for his bankruptcy.

8.  Failed to disclose his interest in his ongoing partnership with Claude Hart and Michael Hilton, II, wherein the partners purchased tracts of property for the mineral rights and/or timber.

9.  Failed to seek court approval for the purchase of property known as the Ramsey Land, even though according to his testimony, he "knew he had to come before this court" in order to secure approval for him to record a different deed of exchange with his nephew.

10. Failed to disclose the debt he owed to Claude Hart and Michael Hilton, II, arising from the purchase of the Ramsey Land.

11. Failed to disclose the value of his interest in timber and potential oil and mineral rights in the property he purchased with his partners, known as the Ramsey Land.

12. Entered into a post-petition transaction with his partners, without prior approval from the Court, whereby his partners would remove valuable assets from the Ramsey Land and retain the proceeds to pay off Mr. Dickenson's post-petition debt to them.

13. Transferred encumbered assets out of the estate without the secured creditor or the Court's permission to the detriment of the secured creditor.

14. Sold cattle post-petition and failed to report or reveal the net proceeds of $36,000 on his Operating Statements or in any other report in the case.

15. Failed to disclose his interest in a life insurance policy.

16. Failed to resolve three or more objections to confirmation.

17. Failed to file a confirmable plan by March 27, 2014, in compliance with the Court's prior

order.  *See May 8 Transcript*, at 4.

18. Filed another plan on May 13, 2014, with leave of court, which did not resolve the

outstanding objections to confirmation.

19. Has yet to file an appropriate and complete Schedule A, Schedule B, Schedule D, or

Statement of Financial Affairs, and, after two prior opportunities to amend, has failed to

convince the Court he is able to do so.

### CONCLUSIONS OF LAW AND ANALYSIS

The question before the Court is whether the conduct of the debtor constitutes cause to

dismiss his case under Bankruptcy Code section 1208.  The chapter 12 trustee urges the Court to

conclude that the debtor's conduct warrants dismissal under section 1208(c)(1), based on the

debtor's repeated failure to provide accurate schedules, failure to confirm a plan, and post-

petition misconduct.  Conversely, the debtor argues that while such conduct may warrant

dismissal, the debtor's representations and actions in this case do not rise to the level to justify

dismissal.

As more fully set forth below, the Court agrees with the trustee and finds that cause exists

to dismiss the case under section 1208(c)(1) and for other good cause under section 1208(c) and

(d).  The Court holds that Mr. Dickenson's behavior throughout the pendency of the case

constitutes not only an unreasonable and prejudicial delay to creditors but also a lack of good

faith in dealing with the creditors and the Court in this case.  Accordingly, cause exists to dismiss

the case.

**A.  Section 1208(c)(1)**

The Bankruptcy Code outlines the circumstances justifying dismissal of a case in section 1208(c).  Specifically, subpart (c)(1) provides, "the court shall dismiss a case under this chapter for cause, including . . . unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors . . . ."  11 U.S.C. § 1208(c)(1).  The Code does not specify a particular length of delay that is considered per se "unreasonable" or "prejudicial;" however, examples of what courts have found to be unreasonable are abundant.  *See, e.g.*, *United States v. Suthers (In re Suthers)*, 173 B.R. 570 (W.D. Va. 1994) (ruling the bankruptcy court's decision not to dismiss a case was an abuse of discretion, when the debtor failed to confirm multiple amended plans over a span of just under three years and violated various court orders, and directing dismissal of the petition for "unreasonable delay"); *In re Carroll*, No. 13-08930, 2014 WL 3571535 (Bankr. W.D. Mich. July 14, 2014) (holding the debtors' failure to file an amended plan "promptly," as indicated by the court's denial of confirmation of an earlier plan and refusal to adjourn the hearing, was "unreasonable" under the circumstances and ran afoul of the intended "swift" disposition of chapter 12 cases).  Consequently, the Court will determine if cause for dismissal exists by considering the specific facts of this case, including the length of the delay, the reason for or explanation of the delay, the impact of the delay on creditors, and how close the debtor is to having a viable plan ready for confirmation.

Mr. Dickenson's case has now been pending for several months,[12] with no confirmed or confirmable plan and consistently inaccurate schedules, and there is little reason to be optimistic circumstances will change any time soon.  As pointed out by the chapter 12 trustee at the June 5 Hearing, Mr. Dickenson has had ample time and opportunity to provide the Court and interested parties with accurate information, but he has failed to do so and has been unable to provide any

---

[12]      At the time of the hearing on June 5, 2014, Mr. Dickenson's case had been pending for ten months.  At that hearing, however, he was requesting yet another continuance once again to amend his schedules and file another plan.  *June 5 Transcript*, at 75–77.

meaningful explanation for the inaccuracies. *June 5 Transcript*, at 73. Without accurate schedules, the Court, trustee, and creditors cannot determine the feasibility or propriety of a proposed plan, and the case cannot progress toward the ultimate goal of plan confirmation and discharge.

At the May 8 Hearing, in attempting to explain the circumstances surrounding his Motion to Exchange, Mr. Dickenson acknowledged that his original Schedule A, filed on August 21, 2013, did not disclose the parcel of real estate he sought to transfer to his nephew, with no explanation as to why. *May 8 Transcript*, at 44. Only a few weeks later, Mr. Dickenson amended his Schedule A ("First Amended Schedule A") to fix some inaccuracies; however, even the First Amended Schedule A did not include his interest in the 200 acres he sought to transfer. *See* Amended Schedule A, Amended Schedule D, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Oct. 4, 2014) ECF Doc. No. 14. Still, Mr. Dickenson could provide no proper explanation as to why he did not include the property in his schedules and still has yet to do so.

Ultimately, despite being filed under penalty of perjury and the many opportunities to correct them, Mr. Dickenson's schedules remain deficient. To date, his Second Amended Schedule A double-counts certain parcels of real estate and may have other deficiencies that remain unknown; he has not disclosed his partnership with Mr. Hilton and Mr. Hart; he has not disclosed a life insurance policy; he has not indicated any transfers of property in his statement of financial affairs; and his valuations of the property on his schedules compared to his testimony before the Court are at odds.

Furthermore, since the filing of the case, Mr. Dickenson has proposed four separate chapter 12 plans for reorganization, none of which the Court can confirm due to the myriad deficiencies in the schedules. It is impossible for the Court, the trustee, or Mr. Dickenson's

creditors to accurately evaluate the sufficiency of the proposed plan without the assurance of

adequate disclosure of his assets and liabilities in his schedules.  Despite all of these misgivings,

Mr. Dickenson has provided no reasonable explanation to quell any fears of the various parties in

this case that he can provide accurate and reliable schedules.

Considering the facts of this case, it appears to the Court that despite many months under

the protections of the Bankruptcy Code, four failed attempts to propose a confirmable plan, and

three attempts to file accurate and complete schedules and statements, Mr. Dickenson's case is

getting more convoluted and perplexing with each passing hearing.  Meanwhile his creditors are

waiting in the wings without payment, as their interests are impaired and collateral is devalued.

Accordingly, the Court finds Mr. Dickenson's repeated delays and failure to propose a

confirmable plan unreasonable, without justification, and harmful to his creditors.  Accordingly,

the case should be dismissed under section 1208(c)(1).

### B.  Other Cause

Similarly, the Court holds that other good cause exists to dismiss the case under section

1208.  As mentioned above, Bankruptcy Code section 1208(c) lists the various circumstances

under which a court may dismiss or convert a case.  Courts across the country, however, have

held the enumerated provisions of subsection (c) are not exclusive, and other circumstances may

rise to the level of necessitating dismissal "for cause."  *See Euerle Farms, Inc. v. State Bank in*

*Eden Valley (In re Euerle Farms, Inc.)*, 861 F.2d 1089, 1091 (8th Cir. 1988) ("Although this

reason for dismissal is not expressly listed in 11 U.S.C. § 1208(c), inequities existed to find

'cause' sufficient for dismissal under the section.  We note a multiplicity of factors may be

considered in the aggregate to meet the cause requirement of the section."); *see also Suthers*, 173

B.R. at 572–73 (citing *Euerle Farms* approvingly and relying on it as precedent for dismissal of a
case for delay in obtaining confirmation).

Thus, a court may dismiss a case by analyzing the totality of the circumstances and
reasoning that cause exists for dismissal based on the debtor's inappropriate and fraudulent post-
petition conduct.[13]  Courts often deem such a dismissal as one for "bad faith."  *See, e.g.*, *In re
Love*, 957 F.2d 1350 (7th Cir. 1992) (discussing the debtor's bad actions in the context of
whether they filed his petition in "good faith"); *In re Suthers*, 173 B.R. 570, 573 (Bankr. W.D.
Va. 1994) ("Second, debtors have shown bad faith in several instances . . . .").  Indeed, the
Fourth Circuit has acknowledged, "a good faith filing requirement is implicit in several specific
provisions of the bankruptcy code," including the original petition.  *Carolin Corp. v. Miller*, 886
F.2d 693, 698 (4th Cir. 1989).  It should be noted, however, such relief is drastic and courts
should be reluctant to dismiss a petition for bad faith.[14]  *Love*, 957 F.2d at 1356.

Courts applying the totality of the circumstances approach consider various factors,
including:

> [T]he nature of the debt, including the question of whether the debt would be
> nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the
> debt arose; the debtor's motive in filing the petition; how the debtor's actions
> affected creditors; the debtor's treatment of creditors both before and after the

---

[13]  Additionally, subsection 1208(d) permits a court to dismiss or convert a case "upon a showing that the
debtor has committed fraud in connection with the case."  11 U.S.C. § 1208(d).  Although the chapter 12 trustee
cited only section 1208(c), section 1208(d) is unique to the context of chapter 12 bankruptcy cases and provides the
court with the authority to consider the debtor's conduct and actions within the case, disrespect of the bankruptcy
process, and candor to the court.  *See In re Zurface*, 95 B.R. 527, 539 (Bankr. S.D. Ohio 1989) (citing the legislative
history to support the proposition that Congress included this provision to foster an environment of good faith and
honest dealing by the debtor throughout the pendency bankruptcy case).

[14]  Nevertheless, the Supreme Court has recognized that nothing in the Bankruptcy Code "limits the authority
of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has
demonstrated that he is not entitled to the relief available to the typical debtor."  *Marrama v. Citizens Bank of Mass.*,
549 U.S. 365, 374–75 (2007).

petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.[15]

*Id.* at 1357.  Ultimately, at the heart of the inquiry is "whether the filing is fundamentally fair to creditors and, more generally, is . . . fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions."  *Id.*  Furthermore, the Fourth Circuit has held that "[o]ne factor in determining good faith is the debtors' honesty in representing facts."  *Harford v. Moore Bros. Co. (In re Harford)*, No. 86-1178, 1986 WL 17681, *1 (4th Cir. Oct. 2, 1986).

Considering the aforementioned factors, the Court finds cause to dismiss Mr. Dickenson's case for his improper post-petition conduct.  As explained more fully below, the Court finds that Mr. Dickenson's actions during the pendency of his case, considering the totality of the circumstances, necessitate dismissal.  Mr. Dickenson has repeatedly failed to disclose assets, failed to provide the Court with complete and correct filings, and failed to comply with various orders of the Court.  Accordingly, in terms of the *Love* factors, mentioned above, Mr. Dickenson's actions have negatively affected his creditors; he has not been forthright with the Court and his creditors; and his actions suggest his filing does not comply with the spirit of the Bankruptcy Code.

a.  **Failure to Disclose**

As extensively detailed above, Mr. Dickenson repeatedly failed to disclose several parcels of real property as well as various property transactions.  A debtor's lack of candor to the Court by concealing assets and transactions undermines the entire bankruptcy process and prejudices creditors.  *See In re Kloubec*, 268 B.R. 173, 178 (N.D. Iowa 2001); *see also Harford*,

---

[15]      Although in *Love*, the Seventh Circuit considered the question of good faith in the chapter 13 context, such analysis applies in the context of a chapter 12 filing as well.  *See Barger v. Hayes Cnty. Non-stock Co-op (In re Barger)*, 233 B.R. 80, 83 (B.A.P. 8th Cir. 1999) (suggesting courts may consider precedent applying identical provisions in different chapters, unless there are practical reasons not to do so).  Here, the dismissal provisions under chapter 13 and chapter 12 are nearly identical; good faith is implied in all filings with the Court; and there are no reasons not to apply the chapter 13 precedent, as the practical considerations for dismissal are identical.

1986 WL 17681, at *1 (affirming the bankruptcy court's ruling that the debtors' lack honesty in representing facts alone was sufficient to dismiss the case, because such conduct placed an undue burden on the trustee to "check up" on the debtor); *In re Alt*, 305 F.3d 413, 421 (6th Cir. 2002) ("Whether the debtor has been forthcoming with the bankruptcy court and the creditors is properly considered in deciding whether dismissal for lack of good faith is appropriate."). Although mistakes and omissions certainly occur, when the debtor demonstrates a pattern of such behavior, dismissal may be appropriate.

In this case, the trustee repeatedly requested and, in addition, the Court directed, that Mr. Dickenson update his schedules to include any omitted properties, yet every time Mr. Dickenson amended, more uncertainty emerged. The Court became aware of Mr. Dickenson's inaccurate disclosures when he filed his Motion to Exchange on April 23, 2014, and revealed that he and his nephew had signed deeds of exchange shortly before the filing of his petition. *See* Motion to Exchange, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Apr. 23, 2014) ECF Doc. No. 75. At the May 8 Hearing, the Court, trustee, and creditors heard evidence concerning the fact that Mr. Dickenson's schedules were not complete. In particular, he had not included the property he sought to transfer to his nephew or the property he had received from his nephew. *May 8 Transcript*, at 44. Furthermore, Mr. Dickenson had not indicated on his statement of financial affairs that he had engaged in this transaction with his nephew. *Id.* at 36–37. Mr. Dickenson had no explanation for either of these omissions. At this hearing, Mr. Dickenson admitted he had likely made other mistakes in his schedules, but he could not identify any other particular omissions or mistakes. *Id.* at 44.

Prior to the next hearing on June 5, Mr. Dickenson, once again, amended his schedules to include his previously omitted parcels of property. *June 5 Transcript*, at 37. Notwithstanding,

Mr. Dickenson still failed to include either the property he had received from his nephew or the existence of the transfer of property between them.  *Id.* at 54.  Also, during the June 5 Hearing, the trustee questioned Mr. Dickenson about his recently revealed transfer of the property known as the "Ramsey Land."  Although Mr. Dickenson had previously disclosed an interest in these properties, a deed of transfer he had filed with the Court suggested he had recently received this property with his two partners.  *Id.* at 55.  According to the deed of transfer, the transaction occurred after Mr. Dickenson had filed his petition.  *Id.*  Additionally, the values Mr. Dickenson disclosed were inaccurate and misleading because he reported the cost at an amount different from what he paid for the Ramsey Land.  *Id.* at 51.

Furthermore, at the June 5 Hearing, Mr. Dickenson disclosed his "partnership" with Claude Hart and Michael Hilton.  *Id.* at 48–49.  Although this was an informal arrangement, as mentioned above, such an understanding is considered a partnership under Virginia law,[16] which the debtor should have disclosed.  Next, the trustee questioned Mr. Dickenson as to why he had disclosed the payment to a life insurance policy in his operating reports, yet he had not disclosed the existence of a life insurance policy in his statement of financial affairs.  *Id.* at 52.  Finally, the trustee asked Mr. Dickenson why he had not disclosed his sale of $36,000 worth of cattle on his operating reports.  *Id.* at 58–59.  Once again, Mr. Dickenson could not provide the Court with any explanation as to why he had not included these interests on his schedules and statements. *Id.* at 49, 52, 58–59.

### b.   Failure to Comply with Court Orders and Bankruptcy Code

Throughout the duration of the case, Mr. Dickenson has repeatedly failed or refused to comply with the various orders and directives of the Court and the Bankruptcy Code and Rules. Not only has he constantly failed to provide the Court with complete operating reports, he has

---

[16]        See *supra* note 8.

also knowingly violated his consent order with Farm Credit of the Virginias and failed to file complete and accurate schedules.

First, Mr. Dickenson failed to provide complete operating reports as required by Rule 2015(b) of the Federal Rules of Bankruptcy Procedure and section 704(a)(8) of the Code. Rule 2015(b) requires a chapter 12 debtor in possession to comply with the requirements of subsection (a)(2)–(4). FED. R. BANKR. P. 2015(b). Subsection (a), clauses (2) through (4) require the debtor in possession:

> (2) keep a record of receipts and the disposition of money and property received;
> (3) file the reports and summaries as required by § 704(a)(8) of the Code . . . ;
> (4) as soon as possible after the commencement of the case, give notice of the case to every entity known to be holding money or property subject to withdrawal or order of the debtor . . . .

FED. R. BANKR. P. 2015(a)(2)–(4). Furthermore, section 704(a)(8) of the Code requires the debtor in possession to "file with the court . . . periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as . . . the court requires . . . ." 11 U.S.C. § 704(a)(8).

Mr. Dickenson's conduct ran afoul of these provisions. At the June 6 Hearing, Mr. Dickenson admitted he had sold a load of cattle, with net receipts of $36,000, yet he did not disclose this income on his monthly operating reports. *June 5 Transcript*, at 58–59. Instead, he testified the proceeds went into a bank account in his sister's name, where she would draft money for him, upon his request. *Id.* at 59. His failure to disclose the receipt of such substantial amounts of money and his retention of such in an undisclosed bank account held by a third party violated the reporting obligations of Rule 2015 and section 704(a)(8).

Second, on January 22, 2014, Farm Credit and Mr. Dickenson filed a Motion for Adequate Protection, wherein Mr. Dickenson would pledge a certain parcel of real estate, in

which he allegedly owned a one-quarter interest, to Farm Credit as adequate protection. *See*

Motion for Adequate Protection, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Jan. 22, 2014)

ECF Doc. No. 52. In exchange for this pledge as well as his pledge of various other parcels,

Farm Credit agreed to postpone prosecuting its motion for relief from stay for nearly a year. *Id*.

The Court approved the consent agreement on March 13, 2014. *See* Order Approving Motion

for Adequate Protection, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. Mar. 21, 2014) ECF Doc.

No. 64.

  At the June 5 Hearing, however, the trustee confronted Mr. Dickenson with a deed signed

on February 19, 2014, which transferred real estate from Garland Ramsey, Betty Lou Mays,

Robert Preston Ramsey, Rebecca Ramsey Sturgill, Paul David Carroll, and Larry Carroll a one-

half interest to Charles Gose Dickenson, Jr., and Barbara Jean Dickenson, as tenants by the

entirety with right of survivorship, and a one-half interest to Michael Hilton, II, and Claude Hart.

Exhibit N at 1, *In re Dickenson*, 13-71283 (Bankr. W.D. Va. June 4, 2014) ECF Doc. No. 122.

One of the tracts of real estate involved in this transaction was the property Mr. Dickenson

pledged as adequate protection to Farm Credit a month *earlier*. Mr. Dickenson could not explain

how he pledged his interest in this property in January, yet the grantors of the deed transferred

two one-half interests to the grantees in February.[17] *June 5 Transcript*, at 59–64.

  Even assuming he did own the property when he pledged it as adequate protection,

though, Mr. Dickenson's conduct remains disconcerting. When discussing the property at the

June 5 Hearing, Mr. Dickenson explained that he did not have to pay anything for the property,

because Claude Hart and Michael Hilton paid for his share. *Id.* at 55. He claimed he owed them

---

[17]  Furthermore, it remains unclear to the Court whether Mr. Dickenson could even pledge the interest,
assuming he owned it at the time, when his ownership was as a tenancy with his wife who is not liable on the debt to
Farm Credit. *See* Exhibits E, F, G, H to Motion for Relief from Stay at 37–52, *In re Dickenson*, 13-71283 (Bankr.
W.D. Va. Oct. 21, 2013) ECF Doc. No. 15.

no money for this transaction; however, he later explained that although Hart and Hilton were timbering the property, he had yet to receive any proceeds, because he needed to pay them back for buying the property for him. *Id.* at 56. Although such an arrangement could be proper, Mr. Dickenson had not procured Farm Credit's consent and was allowing Hart and Hilton to remove valuable assets from Farm Credit's collateral.

Regardless, his conduct was improper. It appears to the Court one of three scenarios occurred: (1) Mr. Dickenson pledged property he did not actually own as adequate protection; (2) he owned the property when he pledged it as adequate protection, but he later transferred it to someone else, who then re-conveyed to it to him and his wife in a form that placed it beyond the reach of Farm Credit; or (3) he obligated himself on further debts to his partners without prior approval and was actively involved in transferring proceeds from the assets pledged as adequate protection out of the estate without the secured creditor's consent.

Finally, as mentioned above, the Court directed Mr. Dickenson to correct his schedules. He failed to do so. At the June 5 Hearing, when confronted about why he had still failed to disclose the transfer of property to his nephew, Mr. Dickenson replied, "I thought we had a specific list to do and I thought I had done that now." *Id.* at 54. Similarly, the schedules still did not disclose his interests in his partnership with Claude Hart and Michael Hilton or an insurance policy, apparently because the Court had not expressly instructed him to reveal such items.

"The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Code." *McClean v. Harlow (In re Harlow)*, 107 B.R. 528, 530 (Bankr. W.D. Va. 1989). "When a debtor signs a schedule and a statement of affairs, he does so under penalty of perjury, and such 'written declarations have the force and effect of oaths.'" *Peoples Bank of Charles Town v. Colburn (In re Colburn)*, 145 B.R. 851, 857 (Bankr. E.D. Va. 1992) (quoting

*Bold City VII, Ltd. v. Radcliffe (In re Radcliffe)*, 141 B.R. 1015, 1021 (Bankr. E.D. Ark. 1992)).

Accordingly, when a court directs a debtor to amend and update schedules, implicit within that

directive is the mandate that the schedules should be correct, even if the court did not expressly

identify each and every defect the debtor should cure.

### c.   Prejudicial Delays

As detailed above, Mr. Dickenson's conduct led to prejudicial delays to his creditors.

The creditors have patiently waited on the sidelines while Mr. Dickenson's case has floundered.

While the creditors waited, Mr. Dickenson improperly obligated himself on further debts; he

devalued a creditor's collateral by transferring property pledged to it out of the estate; and he hid

money in a bank account held by a third party.

Further, however, these delays not only prejudice the creditors by affirmatively devaluing

collateral and the debtor assuming more debt, but they also cause the various parties in interest

other prejudices—most notably, uncertainty.  In *Harford*, the Fourth Circuit explained,

"[m]isrepresentations place a burden on the trustee because most of the burden of checking upon

[sic] debtors' schedules falls upon the . . . trustee and counsel for the . . . trustee." *Harford*, 1986

WL 17681, at *1. Thus, such continually incomplete and improper representations make it

impossible for the creditors to evaluate whether Mr. Dickenson's proposed plans are fair and

proper, or whether the secured creditors' interests are adequately addressed and/or protected.

Similarly, the Court and the trustee cannot evaluate whether the plan complies with the

provisions of the Bankruptcy Code or whether the treatment of the various creditors is equitable.

Thus, these incessant improprieties demonstrate Mr. Dickenson's clear disregard of the spirit and

essence of the Bankruptcy Code and Rules.  *See Love*, 957 F.2d at 1357.

### d.   The Totality of the Circumstances

When a debtor has consistently misrepresented his assets, income, and liabilities and has failed to honor his obligations to the Bankruptcy Court and process, his conduct merits dismissal. Mr. Dickenson's case is similar to *In re Suthers*, another case from the Western District of Virginia, in which the district court determined dismissal was appropriate. *See United States v. Suthers (In re Suthers)*, 173 B.R. 570 (W.D. Va. 1994). In *Suthers*, the district court held that the bankruptcy court abused its discretion by not dismissing the debtors' case for bad faith. *Id.* at 573. Important to this ruling, the district court highlighted the fact that the debtors had incurred further debts without consent of the bankruptcy court, sold collateral securing a creditor's loans without notice or approval, purchased cattle without approval of the court, and incurred other debts for services performed during the pendency of the case without the court's permission. *Id.* Today, we find this ruling instructive and believe Mr. Dickenson's post-petition actions warrant dismissal as well.

This ruling is not one the Court takes lightly. As explained above, Mr. Dickenson did not merely make mistakes. His case was marred with omissions, contradictions, and tribulations, transforming it from that of the "typical" to the "atypical." The Court is aware that honest mistakes happen, and such mistakes may not warrant dismissal for bad faith per se. When, however, a debtor has demonstrated a pattern of deceitful and/or irresponsible conduct that prejudices the creditors and confounds the trustee, the case should be dismissed. In such an instance, the debtor has revealed a lack of respect for the spirit of the Bankruptcy Code and proven himself not to be an "honest but unfortunate debtor."

It appears to the Court Mr. Dickenson is either actively concealing assets from his creditors, or he is not able or willing to provide the Court and interested parties with reliable information sufficient to confirm a plan. Either way, the Court does not believe giving Mr.

Dickenson yet another opportunity to try to amend his schedules is in the best interest of any party.

For all of these reasons, the Court grants the trustee's motion to dismiss.  The Court will enter the order of dismissal after ordering the appropriate disposition of the funds held by the trustee and resolving any other remaining matters.  Accordingly, the Court will set a hearing on October 16, 2014, in the second floor courtroom, United States Bankruptcy Court, 210 Church Avenue, SW, Roanoke, VA 24011, at 2:00PM, to hear and consider the disposition of the pre-confirmation funds held by the chapter 12 trustee or such other and further relief as is necessary before entering the order of dismissal.

### CONCLUSION

Thus, the Court finds that cause exists to dismiss the debtor's bankruptcy case pursuant to the provisions of 11 U.S.C. § 1208 and **GRANTS** the chapter 12 trustee's motion to dismiss. The Court finds that the debtor's actions throughout the case have demonstrated an inability to provide the Court and interested parties with full, clear, and trustworthy information, resulting in unreasonable and prejudicial delays to the creditors and little likelihood of proposing a confirmable plan of reorganization in the future.

The Court will contemporaneously issue an order consistent with the findings and ruling of this opinion.

Date Entered:  September 15, 2014

Rebecca B. Connelly
United States Bankruptcy Judge